ANDREW FARLEY, ADMINISTRATOR, *vs.* WILLIAM C. FITZSIMMONS.

First Judicial District, Hartford, March Term, 1922.

WHEELER, C. J., BEACH, CURTIS, BURPEE and KELLOGG, Js.

An alleged present gift of her entire property for the benefit of others, made by an aged woman while seriously ill, is so obviously improvident as to furnish persuasive evidence of mental incapacity, imposition, or misunderstanding.

The defendant, who was sued for converting two savings-bank books,

Farley *v.* Fitzsimmons

or their proceeds, which comprised all the property of the plaintiff's intestate, alleged in his defense that these books were given to him in trust by the intestate shortly before her death. At that time the decedent, seventy-six years old, was critically ill from apoplexy or cerebral hemmorrhage, unable to talk intelligibly or to communicate except by signs, and she died the following day. The trial court sustained the alleged gift and rendered judgment for the defendant, and the finding embodied, in substance, the existence of a plan agreed upon by the decedent and the defendant for the transfer of the bank books to the latter to carry out a trust already determined; the possession of mental capacity upon the part of the decedent sufficient to recall this plan and to comprehend the nature and effect of the delivery and transfer of the bank books; a statement that such delivery and transfer were for the purpose of carrying out the prearranged plan; and that the defendant received and accepted the bank books as trustee in pursuance of this plan. *Held* that while proof of each of the foregoing statements of fact was essential to the rendition of a judgment for the defendant, the evidence had failed to reasonably establish any one of them, and therefore the plaintiff and not the defendant was entitled to judgment.

Argued March 8th—decided March 29th, 1922.

ACTION to recover savings-bank deposits claimed by the defendant as a gift from the plaintiff's intestate shortly before her death, brought to and tried by the Superior Court in New Haven County, *Hinman, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiff. *Error; judgment to be entered for plaintiff.*

On December 11th, 1919, and until the transfer as hereinafter detailed on January 22d, 1920, Mary Kane had on deposit in the New Haven Savings Bank $10,526.66, and in the Connecticut Savings Bank $3,282.66, which was substantially all the property she possessed. On December 11th, 1919, she was ill and went to live with Mrs. Scholz, and for two days thereafter, and until her death on January 26th, 1920, she was under the doctor's care. About two weeks after she came to live with Mrs. Scholz she requested her to telephone for Father Fitzsimmons, a Roman Catholic

priest in charge of St. Joseph's Parish in New London, her nephew, and between whom there existed reciprocal affection. Father Fitszimmons, in response to this request, visited his aunt. She was confined to her bed; upon his asking her if she wished to see him for anything in particular she said she did, about settling her affairs. He asked her if she had made a will, she replied no. He then advised her that she ought, but she said she didn't care to. She said she wanted to dispose of her property, and wanted him to take care of it for her, and at his request named the seven persons and the amounts she wished to give to them, the whole aggregating $400. The balance she said she wished to leave to charity. She said she thought she would leave it to the "Sisters." The defendant then said: "What Sisters? Here in New Haven are the Little Sisters of the Poor, and there is St. Francis Orphan Asylum, or if you wish I have already bought ground for a convent and if you wish to leave it for the erection of a convent for the Sisters, why, well and good, or for any other purpose you wish." She thought for some time and then said: "I guess I will leave it for the convent, for your convent you are about to build."

Neither at this time nor at any other time did she give instructions to Father Fitzsimmons in reference to the payment of any other amounts to any person whatever, nor as to payments for her living expenses, or, in the event of her death, of the expenses of her last sickness, administration charges, or debts. Father Fitzsimmons advised her to have her brother Patrick attend to the matter for her, and informed her he would see her brother and have him see her. Nothing was said by her or by Father Fitzsimmons in this talk as to the manner in which the disposition of the property was to be carried out, and she did not inform him as to the nature and amount of her property, and he did not

know this, and her bank books were not produced or specifically mentioned.

Father Fitzsimmons saw her brother Patrick and asked him to try and use his influence with her to make a will, but Patrick refused. About a week later he called on his aunt. They again discussed the matter of disposing of her property, and she told him Patrick would not have anything to do with it, whereupon he said: "Well, if he doesn't, I will; I will do as I said; I will look after it for you." He then told her it would be better if she went to the banks and had the transfers made to him, and she said she would do so the first thing when she had recovered sufficiently.

On January 18th, 1920, Mrs. Kane suffered a stroke of apoplexy, accompanied by paralysis of the right arm and leg and the right side of her face and a partial paralysis of her tongue, so that she was unable to speak intelligibly except an occasional word. Her hearing was impaired, and she made her wants known by signs and occasional words. Father Fitzsimmons was telephoned to and came to the house on the following Tuesday, January 20th. During this visit Mrs. Kane recognized him, and took from under her pillow two bank books and handed them to him. He took them, and before he left requested Mrs. Scholz to take care of the books and to send for a lawyer.

In accordance with this request Mr. Walter J. Walsh, a lawyer of New Haven, came to the house about 7 o'clock that same evening. He endeavored to communicate with Mrs. Kane, but was unable to understand her and left. He communicated to Father Fitzsimmons the result of his visit with Mrs. Kane, and on Thursday, January 22d, Father Fitzsimmons called upon her. At his request of Mrs. Scholz, if she knew of some person capable of drawing the transfers of the bank books, she had Mr. Murray come to the house.

Murray went in to Mrs. Kane's bedroom with Father Fitzsimmons, who told Mrs. Kane that Murray had come to draw up the transfer of the bank books to defendant that she had spoken to him about. In response Mrs. Kane bowed her head. Murray drew up the transfers in an adjoining room and then, standing beside her bed, read the two transfers and asked her if she was satisfied and if everything was all right, and she bowed her head. Defendant then asked her if she was willing to sign and she bowed her head. She signed by making her mark, being supported and helped in this by Father Fitzsimmons. While Mr. Murray was in the house Mrs. Kane spoke no words which he understood, and did not herself give him any specific instruction.

From that time until her death, Mrs. Kane had no further discussion with Father Fitzsimmons as to the manner in which the money was to be distributed. The next day he took the bank books and orders to the banks and caused the deposits to be transferred to his own name. He also drew $100 from one deposit and left it with Mrs. Scholz to pay for the immediate needs of Mrs. Kane. After the death of Mrs. Kane he drew from the deposits and paid the seven persons as directed by Mrs. Kane. He also drew $2,000 from the deposits and placed it in the treasury of his church in New London; the balance remains on deposit in these banks. From the $2,000 placed in the treasury of his church, Father Fitzsimmons paid the funeral expenses of Mrs. Kane, and gave Mrs. Scholz $50 extra for her services in caring for Mrs. Kane. He made these payments on his own responsibility, and assumed that he was to do so because he was to look after her affairs.

*Charles J. Martin,* for the appellant (plaintiff).

*Arthur T. Keefe,* for the appellee (defendant).

WHEELER, C. J. The facts as detailed in the finding are not questioned, except as to two paragraphs, viz: "62. Mrs. Kane was, at the time when the bank books were delivered by her to defendant, and when the orders were executed, mentally capable of recalling and comprehending the plan made and discussed with defendant prior to the stroke, and understood the nature and effect of the delivery and transfer. 63. She delivered the bank books to defendant and executed the orders for the purpose of carrying out the plan of transfer to the defendant of her property, to be by him distributed and disposed of, as had been previously discussed and decided upon by her, and the defendant received and accepted the same as trustee for said purposes."

Unless the finding as to these paragraphs can be sustained, the judgment must necessarily be reversed. These findings presuppose (1) the existence of a plan agreed upon by Mrs. Kane by which these bank books were to be transferred to Father Fitzsimmons to carry out a determined trust; (2) the possession by Mrs. Kane, at the times the books were delivered and the orders were executed, of mental capacity capable of recalling and comprehending this plan and the nature and effect of the delivery and transfer; (3) that the delivery and execution were for the purpose of carrying out this prearranged plan; and (4) that Father Fitzsimmons received and accepted the bank books as trustee in pursuance of this plan.

Our most diligent study of the evidence fails to satisfy us that either of these propositions was reasonably established. Up to the time the bank books were delivered to Father Fitzsimmons, the manner in which Mrs. Kane should dispose of her property had not been definitely decided upon. This would seem to follow from the fact that Father Fitzsimmons himself endeavored to get Mrs. Kane to make a will, then to have

her brother Patrick influence her to make her will, and finally, on January 20th, two days after she had suffered a severe shock, he caused a lawyer to see her for the purpose of having her make a will. If a definite plan had been agreed upon by her of transferring the books to him, he would not have persistently endeavored to have her make a will. The plan must be found in the first interview between Father Fitzsimmons and Mrs. Kane, after her first illness in December. She then told him she wanted to dispose of her property and wanted him to take care of it for her. She, at his request, named seven persons to whom she wished to give named sums. The balance she wanted to give to charity, and upon his suggestion that she leave it for a convent for the Sisters of his church at New London, she said: "I guess I will leave it for the convent, for your convent you are about to build." At this time Mrs. Kane did not state the amount of her possessions nor the nature of her investments, and Father Fitzsimmons did not know these, and nothing was then said about the transfer of the bank books. At most, she had expressed only her expectation as to the gift for the convent. Nothing too, was said at this time as to the manner in which the disposition of her property was to be carried out. She did not then, nor at any other time, definitely determine upon this disposition of the residue.

Furthermore, Father Fitzsimmons never agreed specifically to make the gifts Mrs. Kane suggested; all that he said was that he would look after it for her. His commitment is as indefinite as is hers. No plan as determined upon by Mrs. Kane can be found from this interview. Nor would it be possible to establish out of it a trust in Father Fitzsimmons as to the proceeds of these bank books.

In the next interview between Mrs. Kane and Father

Fitzsimmons, evidently the existence of the bank books and their transfer had been mentioned, since he advised her to go to the banks and have the money transferred to him, and she said she would do so the first thing when she had sufficiently recovered. No reference was made at this time to the disposition of the funds, nor as to whether she had decided to give the residue to the convent at New London. The additional facts as developed in this interview, taken in connection with those of the first interview, do not establish the plan and trust upon which defendant relies.

On Sunday, January 18th, Mrs. Kane suffered a severe stroke. On the following Tuesday, the 20th, Father Fitzsimmons saw her and she then handed to him the two bank books. On the following Thursday, the 22d, Mrs. Kane, by her mark, executed transfers of the accounts upon these books. At this time Father Fitzsimmons told her Murray had come to draw up the transfer of the bank books to him. Aside from this, nothing more appears in evidence from which a plan or trust as agreed upon by Mrs. Kane could be found. It is evident that nothing occurred after Mrs. Kane suffered her shock which helps to establish the plan or trust.

It is likewise clear that from anything appearing in evidence it cannot be found that Father Fitzsimmons received and accepted the bank books as trustee in pursuance of the plan or trust which he alleges. Aside from the impossibility of establishing the plan from the evidence, it appears, and we think incontestably, that Mrs. Kane did not, at the delivery of the bank books and at their execution, possess mental capacity to recall and comprehend this plan, or to understand the nature and effect of the delivery and transfers. She delivered the bank books two days after suffering an apoplectic stroke accompanied by paralysis of the

right side, arm, leg and face, and a partial paralysis of the tongue, and when she could not speak intelligibly except an occasional word. She delivered the books without uttering a word. She did no act except to deliver the books. So far as appears nothing occurred from which the possesion of mental capacity could have been found.

That evening Mr. Walter J. Walsh, the lawyer whom Father Fitzsimmons caused to be summoned, found that he could get no information whatever from Mrs. Kane and so had to abandon his attempt to draw her will. Mr. Walsh testified that Mrs. Kane did not at this time know and comprehend what was going on about her, and did not know anything that he was talking about. Mrs. Kane's condition continued to grow worse. When two days later Murray drew the transfers and read them in her presence and asked her if she was satisfied and willing to sign, she merely bowed her head. When Father Fitzsimmons told her Murray had come to draw up the transfer of the bank books to him, she also merely bowed her head.

There was nothing which occurred at this time from which it could be fairly found that she knew and comprehended what was going on about her, much less that she comprehended that what was being done was the consummation of a plan determined upon in an interview between Father Fitzsimmons and herself by which she was to transfer to him her bank books upon a predetermined trust. We should find it difficult to sustain a finding, except upon convincing proof, that a woman had made a transfer of her entire possessions for the benefit of others, when she was seventy-six years of age and sick, and by her act stripped herself of everything she had and retained nothing for her sustenance, her care in sickness, the payment of her just debts and her funeral expenses. The improv-

idence of such a transaction would be persuasive evidence of mental incapacity, or imposition, or misunderstanding.

These considerations are conclusive of the case. Hence we find no occasion to decide upon the effect in law of the plan as claimed, assuming that the facts as found by the court had not been corrected.

There is error, the judgment is reversed and the Superior Court directed to enter judgment for the plaintiff for $15,466.44.

In this opinion the other judges concurred.